Case 3:24-mj-00266-RMS   Document 1-1   Filed 03/26/24   Page 1 of 19

United States District Court
District of Connecticut
FILED AT NEW HAVEN

3/26 ,20 24

By N. Langello
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELLULAR TELEPHONE SEIZED FROM SHAYQUAN GRAY AND THAT CURRENTLY IS LOCATED IN THE EVDIENCE LOCKER OF THE ATF AT 150 COURT ST., NEW HAVEN, CONNECTICUT | Case No. 3:24-mj-266 RMS |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Michael Oppenheim, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device, described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of the electronically stored information described in Attachment B.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since August 2001. Since becoming a law enforcement officer, I have participated in hundreds of investigations of firearms violations and have conducted or participated in surveillances, the execution of search warrants, and the debriefing of informants and cooperating witnesses. I have also examined firearms dealer records, inspected dealer premises, and investigated both licensed and unlicensed firearms dealers. Through training, education, and experience, I have become familiar with the documents and records, to

include electronic information, possessed by dealers and owners of firearms, and the manner in which individuals unlawfully possessing or dealing in firearms store, maintain, or use firearms.

3. As a law enforcement officer, I have utilized pen registers, geolocation data, Title III wiretaps, social media exploitation, and other investigative techniques related to cellular devices numerous times in the past while conducting and in furtherance of firearms and narcotics trafficking investigations.

4. As an ATF Digital Media Collection Specialist (DMCS), I have examined more than 200 digital devices, most of which were cellular telephones. In doing so, I have utilized multiple techniques to examine and/or extract data from devices in a forensically sound manner. In most instances, I have conducted a partial or thorough analysis of the extracted data.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (possession with intent to distribute controlled substances), 18 U.S.C. §§ 922(g)(1), 924(a)(8) (unlawful possession of ammunition by a convicted felon), and 18 U.S.C. § 924(c)(1)(A)(i) (possession of a firearm in furtherance of a drug trafficking crime) (collectively, "the Target Offenses") have been committed by SHAYQUAN GRAY, a/k/a "Scooby," and others unknown. There is also probable cause to believe that located in the property described in Attachment A there will be evidence, instrumentalities, or fruits of these crimes that will lead to the identification of individuals who are engaged in the commission of these offenses, to include GRAY'S suppliers and customers, and other evidence relevant to this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. The property to be searched is the following, which was seized by the New Haven Police Department and then ATF from GRAY's person on March 14, 2024, incident to his arrest:

   a) One Samsung, model SM-950U1 (Galaxy S8), serial number: RF8J82CQWRZ (the "TARGET TELEPHONE")

8. The TARGET TELEPHONE is currently located at the ATF New Haven Field Office, 150 Court Street, Rm 643, New Haven, Connecticut.

9. The applied-for warrant would authorize the forensic examination of the TARGET TELEPHONE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### March 14, 2024 Arrest

10. In approximately February 2024, members of the New Haven Police Department (NHPD) received information that SHAYQUAN GRAY (born 2000) had an active warrant out of the Wallingford Police Department for Risk of Injury to a Minor, Assault in the Second Degree, and other domestic-violence-related charges. Prior to March 14, 2024, NHPD officers also received information from a Confidential Informant (CI), an NHPD informant who has provided reliable information in the past, that GRAY was selling narcotics in the area of Ferry and English Streets in the Fairhaven section of New Haven and was in possession of a firearm.

11. On or about March 14, 2024, at approximately 1:45 pm, while NHPD officers were conducting surveillance in the area of Ferry Street and English Street, they observed a Black male wearing a black jacket, gray sweatpants, and a black ski mask partially covering his face. The male resembled GRAY's general physical description. Officers then confirmed that there was, in fact, an active arrest warrant for GRAY.

12. Officers conducted surveillance in the area and observed the male matching GRAY's description walk to a silver sedan and conduct what appeared to be a hand-to-hand drug transaction through the driver's side window with the driver of the sedan. As the male matching GRAY's description turned around, a detective observed the male to be counting money and saw him place the money into his left pants pocket. As the silver sedan pulled off, officers began to converge on the male to investigate the hand-to-hand drug transaction and to attempt to confirm if the individual was, in, fact, GRAY.

13. The suspect individual observed officers approaching and began to walk in the opposite direction. As officers got closer, the male began running down Ferry Street. Officers gave chase and after a short foot pursuit the male was apprehended and identified to be GRAY.

14. A search of his person, incident to the arrest of GRAY on the outstanding state warrant, revealed a clear plastic sandwich bag containing approximately eighty (80) small clear plastic zip lock bags each containing a white rock-like substance, which later field tested positive for the presence of cocaine. Based on my training and experience and having seized cocaine base ("crack cocaine") on numerous occasions, I believe that the recovered narcotics are consistent with crack cocaine. I know through my training and experience that drug dealers will package larger amounts of narcotics into small portions for street-level sales. Inside GRAY's pants, officers recovered a loaded gray 9mm Polymer80 Privately Made Firearm (PMF). GRAY also had over $1,200.00 in U.S. Currency on his person. Officers also seized the TARGET TELEPHONE from GRAY's person at this time.

15. Based on the observations of the officers, which included an apparent drug sale, the amount and packaging of the crack cocaine, and the large amount of cash possessed by

GRAY, I believe that he was engaged in the distribution of narcotics, specifically, crack cocaine, at that time.

16. I am also aware that the ammunition within the firearm seized from GRAY's person included rounds manufactured by Winchester, Speer, and Federal. I know from my training and experience as an ATF Special Agent that none of these rounds was manufactured within the state of Connecticut.

17. I know that GRAY is a convicted felon, having been convicted of Weapon in a Motor Vehicle, in violation of Conn. Gen. Stat. § 29-38, on or about June 25, 2019 (sentenced to three years' jail, suspended, followed by two years of probation), and Robbery in the Third Degree, in violation of Conn. Gen. Stat. § 53a-136, on or about December 30, 2020 (sentenced to five years' jail, suspended after 18 months, followed by three years of probation), both crimes that are punishable by more than one year imprisonment.

18. On March 14, 2024, after his apprehension by NHPD as described above, ATF Task Force Officer (TFO) Matthew Borges appeared, via telephone, before U.S. Magistrate Judge Robert M. Spector, and obtained a criminal complaint charging GRAY with violations of the Target Offenses. *See United States v. Gray*, Case No. 3:24mj223 (RMS).  GRAY, who had complained of pain to his jaw because of the foot chase that led to his arrest, had been transported to Yale New Haven Hospital for evaluation and/or treatment, where he remained for several hours following his arrest. At the hospital, GRAY was not determined to require any additional medical treatment.

19. Once released from the hospital, GRAY was transported to NHPD headquarters, arriving at approximately 7:00 p.m.  Shortly thereafter, GRAY waived his *Miranda* rights by executing a NHPD rights form and agreed to speak to investigators. TFO Borges, NHPD

Detective Steven Cunningham, and I conducted an audio- and video-recorded interview of GRAY.

20. During the interview, GRAY admitted to possessing the firearm and narcotics. He further stated that he had the firearm for his protection, for approximately one day. For reasons more fully described below, I believe that GRAY was attempting minimize the amount of time he actually possessed the firearm. When specifically asked if he was selling drugs to make some money, GRAY stated, "if that's what you call it." After the interview was completed, GRAY was detained at the NHPD detention area as authorized by Judge Spector.

21. The next morning, March 15, 2024, TFO Borges and I brought GRAY to the U.S. District Court, New Haven, Connecticut. At approximately noon, I brought a lunch to GRAY within the U.S. Marshals Service cellblock. I spoke with GRAY and brought up the fact that the day prior, he had mentioned that he was hoping to have his girlfriend pick up the phone he had been using previously (*not* the TARGET TELEPHONE) from the custody of the Wallingford Police Department (this was based on an unrelated incident that occurred on or about February 12, 2024). I used this as a segue to explain that ATF would likely be seeking a search warrant for the cell phone recovered from him at the time of his arrest, and that I believed a judge would issue the warrant, based on the facts of the case. I further advised GRAY that such a warrant would likely be limited to data from between one and two weeks prior to his arrest and the seizure of the TARGET TELEPHONE.

22. I explained that if he provided the passcode to the TARGET TELEPHONE, ATF would be able to provide the device to his girlfriend in a relatively short time, compared the possibly long time it would take to examine the TARGET TELEPHONE without the passcode. I also told GRAY that he could consent to the search of the TARGET TELEPHONE, and that

ATF would then be able to return the item to his girlfriend within a day or two. I reenforced the fact that GRAY was under no obligation to consent to a search of the TARGET TELEPHONE, and that there was no guarantee that the Court would issue a search warrant for it, but that I would almost certainly be seeking a search warrant for the TARGET TELEPHONE.

23.     At that point, GRAY agreed to provide consent to search the TARGET TELEPHONE and he executed an ATF Consent to Search form, which stated, "Black Samsung S8 cellphone + contents," and provided the passcode for the device – "1234."

24.     Shortly after obtaining consent from GRAY, I returned to the ATF office, as it was approximately 12:30 p.m., and GRAY's court appearance had been scheduled for 3:00 p.m. I then extracted the contents of GRAY's device, and briefly examined a small portion of the data to ensure that the extraction had been successful. I was in the process of preparing a Cellebrite report of the data when I had to return to court for GRAY's initial appearance. Myself and TFO Borges escorted GRAY to court, where he was ordered detained, and then we brought GRAY back to the U.S. Marshals cellblock.

25.     Just as GRAY was being returned to a cell, he brought up the issue of the TARGET TELEPHONE to me and said that he wanted to make sure ATF was only looking at two weeks' worth of data. I explained to GRAY that that was not what he had consented to, and that I had advised him that this was a limit that would likely be imposed by a judge but was not part of the consent as given. GRAY claimed that this was not his intent, either legitimately misunderstanding me earlier in the day, or pretending to have done so to limit ATF'S access to the data withing the TARGET TELEPHONE. Ultimately, I agreed that ATF would only examine data from within the two weeks prior to the seizure of his phone and advised GRAY of same.

26. After my last conversation with GRAY, I had no further interactions with the TARGET TELEPHONE or the extracted data and consulted the U.S. Attorney's Office. Although GRAY does not appear to me to have revoked his consent to a search of the data on the TARGET TELEPHONE limited to the past two weeks, out of an abundance of caution I am seeking a search warrant to authorize the search of the TARGET TELEPHONE. In addition, based on the facts presented below, I am seeking authorization to search the TARGET TELEPHONE for the period February 19, 2024, to present.

**February 19, 2024 Robbery**

27. Shortly after GRAY's arrest, I learned of the following incident that had occurred in New Haven. According to reports written by NHPD officers, on or about February 19, 2024, NHPD officers were dispatched to 321 Eastern Street, apartment 1019, New Haven, Connecticut, for a report of an armed robbery. In sum, a visibly injured victim advised officers that while he was reentering his apartment from the 10th floor lobby, an Hispanic female and an Hispanic male in a ski mask began following him and put a gun to the back of his neck. After some words were exchanged, the victim attempted to flee into his apartment. The male assailant beat him about the face with the firearm and pushed his way into the residence with the victim. As the victim and the male fought, the female sprayed the victim with pepper spray. Ultimately, the victim reported that the two robbers stole a few items and two iPhones.

28. On or about February 24, 2024, NHPD officers were guarding arrestees at Yale New Haven hospital. An Hispanic female arrestee (whose identity I know) indicated to one of the officers that she wanted to provide information about a recent incident and listed the building where the February 19, 2024, armed robbery had occurred. The officer, familiar with that incident, observed that the female matched the description of the female suspect from the

8

robbery. As the female spoke, she provided details that led the officer to believe that she had accurate information about what had occurred. Additionally, while not reported by the victim, the female advised that the items taken during that robbery included a duffle bag and a firearm. The female further advised that the victim was known to pick up his supply of drugs on Mondays (February 19, 2024, was a Monday).

29. The officer asked the female if she knew who had committed the robbery, and she stated that she and her boyfriend had done so. The officer then advised the female of her *Miranda* rights and asked her for further information about the robbery. In addition to other information, the female advised that the firearm she and her boyfriend had stolen had been sold to a tall thin black male known to her as "Scooby." She further indicated that "Scooby" lived at an address on English Street and drove a black Toyota Camry with tinted windows. I know from my experience and involvement in this and a related RICO investigation that GRAY's street name is "Scooby." I learned from persons within NHPD familiar with GRAY that he has resided on English Street and was known to operate a black Toyota Camry with tinted windows. When asked, the female described the firearm has having a blue slide and an extended clear magazine, which based on my training and experience, is an atypical combination of parts colors.

30. The female further advised that "Scooby" picks up drugs from the complex where the robbery occurred, and that she and her boyfriend sold the firearm to GRAY either directly in exchange for drugs or to improve their drug customer relationship with him.

31. I have examined the firearm taken from GRAY's person on March 14, 2024, and observed it to be a PMF with a blue slide and a clear magazine. Based on this, and the statements by the female referenced above, I therefore believe the firearm recovered from GRAY and the firearm stolen on February 19, 2024, to be one and the same.

32. From my training and experience, I have learned that individuals typically carry their cellular phones on their person so that they can communicate with others, and that persons engaged in street-level narcotics dealing, as GRAY appears to have been, overwhelmingly use their personal cellular devices, such as the TARGET TELEPHONE, in furtherance of their activities. I have also observed, via the review of hundreds of such devices, that evidence of same remained within the device the majority of the time. I also know, based on my training and experience, that persons unlawfully in possession of firearms often have photographs and videos featuring the possessed firearm, as often such persons keep pictures as mementos or trophies of their acquisition of the firearm. Often, there are conversations within a device specifically about obtaining or purchasing the firearm, as there are often negations that occur before the transfer.

33. I have also observed a still image from surveillance video footage of GRAY taken just prior to his apparent narcotics transaction and arrest on March 14, 2024. In this image, GRAY is clearly seen interacting with his cellular telephone. Based his subsequent meeting with a likely drug customer, I believe it is more likely than not that GRAY was communicating with that drug customer at that time and thus that evidence of his distribution of narcotics will be found on the TARGET TELEPHONE.

34. Based on my training, experience, and research, I know that the TARGET TELEPHONE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## GENERAL INFORMATION CONCERNING THE USE OF CELLULAR TELEPHONES IN FURTHERANCE OF DRUG TRAFFICKING

35. Based on my training and experience, I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. I know, based upon my training and experience, that narcotics traffickers and distributors often segregate various aspects of their illicit business, and use different telephones when tending to each of the various aspects, in an effort to thwart law enforcement and insulate themselves and their confederates. For example, drug dealers often use one telephone to contact customers and another to contact their narcotic source(s) of supply.  In addition, narcotic traffickers and drug dealers often use different telephones to deal with different "lines" of customers.  For example, a drug dealer may use one telephone to contact customers who regularly purchase small, pre-packaged quantities of narcotics and another telephone for customers who regularly purchase larger quantities or may use different telephones to distribute different types of narcotics.  Similarly, drug dealers whose business extends into multiple states also sometimes use one telephone for local customers and another telephone for out-of-state customers.

36. Finally, notwithstanding the foregoing, I know that drug dealers may use two or more cellular telephones interchangeably for all their narcotics trafficking undertakings.  This enables distributors to accommodate a high volume of narcotics trafficking calls. The use of two or more telephones interchangeably also enables distributors to immediately terminate service on one telephone without crippling their illegal business, if they believe the telephone is being targeted by law enforcement for installation of a court-authorized wiretap.

37. Based on my training and experience, I also know that narcotics traffickers use various features of and applications on their phones, such as calls, messenger, and text messaging, to contact each other and arrange drug transactions. Further, based on my training and experience, I know that narcotics traffickers often utilize phone applications such as Signal, WhatsApp, Wickr Me, and others to exchange encrypted messages and calls with customers, sources of supply, and co-conspirators in an effort to preclude law enforcement from intercepting these communications. Narcotics traffickers also use their phones to store contact information for customers, suppliers, and other criminal associates. Narcotics traffickers access internet-based applications, such as Facebook or Snapchat, in furtherance of their trafficking activities, and use their phones' GPS or location services to arrange meetings and find meeting locations to conduct narcotics transactions. In addition, based on my training and experience, I know that narcotics traffickers often have photographs or videos of themselves, contraband, co-conspirators, and assets purchased with drug proceeds; these photographs and videos are frequently stored electronically on wireless telephones and other electronic devices. Lastly, based on my training and experience, I know that with the advent of online banking services, peer-to-peer money transfer services such as Venmo and CashApp, and digital wallet services such as Apple Pay and Google Pay, that narcotics traffickers use cellular phones to pay drug debts, transfer or request payments, or launder proceeds from their unlawful activities.

38. In my training and experience and in conversations with other law enforcement officers familiar with drug trafficking activity, I know that drug traffickers often carry their cell phone(s) on their person to narcotics transactions to facilitate the meeting, to communicate with the associates they intend to meet with on an ongoing basis, and to keep track of the whereabouts of their associates en route to a meet location and while they are at their stash locations. Having

the cell phone on their person allows the meet location to be changed very quickly or set at the last moment, which is often a counter-surveillance ploy. In addition, having the cell phone(s) on their person allows them to conduct business more efficiently and while on the move even when they visit stash locations or sources of supply. Having a cell phone on their person also allows a drug trafficker to arrange other transactions while going to one transaction to ensure a consistent flow of business.

## GRAY'S PRIOR USE OF DEVICES RELATED TO THE TARGET OFFENSES

39. As referenced above, I am a principal investigator for a separate but related investigation into racketeering and related offenses by members of the Exit 8 gang, of which I believe GRAY is a member or associate. I am also aware that GRAY was incarcerated for large parts of the past approximately five years. I know that GRAY was in Department of Corrections (DOC) custody from approximately March 5, 2019, through June 25, 2019; February 29, 2020, through March 6, 2020; August 4, 2020, through July 19, 2022; August 15, 2022, through July 7, 2023, when he was released to community supervision (a halfway house). GRAY was discharged from his sentence on January 17, 2024. As part of the Exit 8 investigation, law enforcement has obtained, via search warrants or consent, the contents of a number of social media accounts and cellular telephones. Despite GRAY being incarcerated for a significant period of time related to the records obtained, I have identified social media accounts and prior telephone numbers I know to belong to GRAY that have a number of interactions with the various data sets obtained.

40. From within the data, I observed a number of occasions, spanning September 2018 through March 2020, where GRAY offered to sell marijuana to at least two people. These conversations occurred via text message and Facebook Messenger. I also observed a

conversation in February 2020, where an individual asked GRAY if GRAY had his firearm with him, as the other individual wanted to rob a third party with GRAY. GRAY has a number of Facebook Messenger calls and video calls, leading me to believe that he primarily, if not exclusively, accessed Facebook Messenger via a mobile device, as this is, by far, the way in which most users access that application when making calls, in my experience.

41. While interactions with GRAY's prior devices related to the Target Offenses are somewhat limited due to how long he was incarcerated during the time period under investigation, GRAY's use of his prior mobile devices leads me to believe that he has a pattern of using his mobile device to sell narcotics and make or receive references to his possession of firearms. I further believe that this pattern is very likely to have continued in relation to the TARGET TELEPHONE.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

43. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET TELEPHONE because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  44. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET TELEPHONE consistent with the warrant. The examination may require authorities to employ

techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the TARGET TELEPHONE to human inspection in order to determine whether it is evidence described by the warrant.

45.   *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

46.   I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the TARGET TELEPHONE described in Attachment A to seek the items described in Attachment B.  Because there is evidence that GRAY obtained a firearm that was stolen on or about February 19, 2024, and the TARGET TELEPHONE was seized on March 14, 2024, I believe that a search warrant authorizing a search of the TARGET TELEPHONE including and between these dates is reasonable in temporal scope.

Respectfully submitted,

MICHAEL OPPENHEIM
Digitally signed by MICHAEL OPPENHEIM
Date: 2024.03.26 09:51:31 -04'00'

MICHAEL OPPENHEIM
SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

Subscribed and sworn to before me by telephone on March 26, 2024, in New Haven, Connecticut.

Robert M. Spector
Digitally signed by Robert M. Spector
Date: 2024.03.26 13:08:57 -04'00'

THE HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

One Samsung, model SM-950U1 (Galaxy S8), serial number: RF8J82CQWRZ, seized from the person of Shayquan GRAY, a/k/a "Scooby," on March 14, 2024, by the New Haven Police Department (NHPD) and then ATF, which currently is in the possession of ATF in New Haven, CT (the "TARGET TELEPHONE").

## ATTACHMENT B

All records on the TARGET TELEPHONE described in Attachment A that relate to violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) (possession with intent to distribute controlled substances), 18 U.S.C. §§ 922(g)(1), 924(a)(8) (unlawful possession of ammunition by a convicted felon), and 18 U.S.C. § 924(c)(1)(A)(i) (possession of a firearm in furtherance of a drug trafficking crime) and involve Shayquan GRAY from February 19, 2024, until the date of seizure, including:

a. the telephone number, ESN number, serial number, and SIM card number, or any other unique identifying numbers;

b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory;

c. descriptions of times, dates, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d. all records, however created or stored, which demonstrate ownership and use of the device;

e. all records providing identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, notes, memos, and photographs of persons contained in the device;

f. any evidence showing the identity of the maker or user of the data and information contained in the device, such as passwords, sign-on codes, and program design;

g. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

h. saved searches, locations, and route history in the memory of said devices;

i. internet browsing history, to include internet searches in the memory of said device; and

j. images and videos in the memory of said device; and

k. Any conversations on applications downloaded onto the device, including social media and text message applications, including but not limited to iMessage, Facebook messenger, Snapchat, and other similar social media platforms.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information, and images seized may be reproduced by printing, converting, or copying into storage in another device, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.

It is specifically authorized that the warrant will be deemed executed once the seized items are extracted from the phone and that further analysis of the seized items extracted from the phone is permitted.